EBEL, Circuit Judge:
In this direct criminal appeal, Defendant Matthew Caniff challenges his convictions for three federal child sex offenses. Having jurisdiction under 28 U.S.C. § 1291, we AFFIRM each conviction. In doing so, we hold, among other things, that Caniff's text messages asking a person he thought was a minor to send him sexually explicit pictures of herself can support a conviction for making a "notice" to receive child pornography in violation of 18 U.S.C. § 2251(d)(1)(A).
I. BACKGROUND
The evidence at trial, viewed in the light most favorable to the jury's verdict, see United States v. Dixon, 901 F.3d 1322, 1335 (11th Cir. 2018), cert. denied, --- U.S. ----, 139 S.Ct. 854, --- L.Ed.2d ----, 2019 WL 113506 (2019), established the following: St. John's County, Florida law enforcement initiated an operation to locate individuals who have a sexual interest in children and who were willing to act on that interest. As part of the operation, FBI Special Agent Abbigail Beccaccio posed as "Mandy," a thirteen-year-old girl, on "Whisper." Whisper is an online website and cellphone application "that allows users to text or communicate anonymously with other users." (Aplt. Br. 3.) Whisper's "terms of use" provide that "individuals who use Whisper must be at least 13 years of age ... and that if you are between the ages of 13 and 18, that you should be supervised by a parent." (Doc. 79 at 35-36.)
On the afternoon of March 31, 2016, Agent Beccaccio posted on Whisper a photo of another FBI employee taken when that employee was in her early twenties. The FBI had "age regress[ed]" that photo to make the person in it look "more childlike and youthful." (Doc. 79 at 37-38.) The photo showed "Mandy" dressed in a heavy sweatshirt or coat worn over another shirt; Mandy was not dressed or posed in any sexually suggestive manner. Agent Beccaccio posted this picture with the words: "Spring Break! And I'm BORED!!!!!!" superimposed over the photo. (Gov't ex. 1.)
Caniff, a thirty-two-year-old pharmacy technician, responded, stating "Let's do something then," followed by a "winky smiling face" (Doc. 79 at 41, Gov't ex. 2 at 1). Mandy asked if Caniff was on spring *931 break too; he responded that he was "[t]otally off today." (Doc. 79 at 42-43; Gov't ex. 2 at 2.) Caniff wanted to "do something water related." (Gov't ex. 2 at 3.) Mandy asked Caniff if he was old enough to drive; Caniff said he was; Mandy responded: "Sweet!! I'm not old enough too [sic]." (Id. at 4.) Caniff then asked Mandy if she had a bikini and was it cute. (Id. at 5.) Caniff soon agreed with Mandy to leave Whisper and instead text message each other.
Caniff and Mandy exchanged text messages the rest of that afternoon and evening. Although Mandy told Caniff several times at the outset of their text messaging that she was thirteen years old, Caniff's text messages to Mandy turned sexual and eventually became quite explicit and graphic. Caniff also sent Mandy several pictures of his penis and asked her to send him pictures of her genitalia and of her masturbating. When Mandy asked if she could get in trouble, Caniff responded that "[t]he only one of us the [sic] could get in trouble would be me." (Gov't ex. 3 at 3.) Eventually, Mandy agreed to have sex with Caniff.
Before driving an hour and a half to meet Mandy, who said she was home alone, Caniff asked Mandy if she was a cop. She responded, "[l]ike 13 year old [sic] are cops!" (Id. at 14.) Caniff said Mandy "could be pretending to be 13." (Id. ) Mandy said she was not. Mandy asked Caniff what he was bringing her; he said he had Xanax to share with her. Fate almost intervened for Caniff when his car broke down on his drive to Mandy. But he was able to get his car working again and arrived at Mandy's home at approximately 1:30 a.m. where he was arrested.
After his arrest, Caniff consented to agents searching his computer, cell phone and other electronic devices, as well as his vehicle. Agents found only adult pornography on Caniff's phone, and no child pornography anywhere. Caniff also gave agents information that would enable them to access his social media accounts; officers found nothing incriminating there, either. There was Xanax in Caniff's wallet, which Caniff said he found in the trash at the pharmacy where he worked.
After giving Caniff Miranda [1] warnings, officers interviewed him. During that interview, Caniff acknowledged that Mandy had told him she was thirteen, but he stated that on the Whisper "application, it says that you have to be at least 17 or 18 to download,[2] so I assumed that that was the age. I thought that there was some kind of role-playing going on." (Gov't ex. 27A at 5 (footnote added); see also id. at 9-10 ("I thought we were role-playing ... because ... the site says that you have to be an adult ..., so I believe that you have to be an adult. ... I assumed that she was role-playing. ... I assumed that I wasn't meeting a juvenile.").)
The United States charged Caniff with three offenses: 1) attempting to entice a minor to engage in illegal sexual conduct, in violation of 18 U.S.C. § 2422(b) ; 2) advertising for child pornography, in violation of 18 U.S.C. § 2251(d)(1)(A) and (2)(B) ; and 3) attempted production of child pornography, in violation of 18 U.S.C. § 2251(a). For these federal offenses, a minor is defined as "any person under the age of eighteen years." 18 U.S.C. § 2256(1). Count 1 relied on Florida law, which defines a minor to be under sixteen years of age. These offenses required the *932 Government to prove, not that there was an actual child victim, but that Caniff believed he was texting with a minor. See United States v. Rothenberg, 610 F.3d 621, 626 (11th Cir. 2010) ( § 2422(b) ); United States v. Lee, 603 F.3d 904, 913 (11th Cir. 2010) ( § 2251(a) ). At trial, Caniff's primary defense was that he believed he was, instead, communicating with an adult who was role playing as a thirteen-year-old. The jury rejected that defense and convicted Caniff of each of the three charged offenses. The district court imposed three concurrent fifteen-year sentences, followed by five years' supervised release.
II. DISCUSSION
A. Caniff's text messages requesting that Mandy send him sexually explicit photos can support an 18 U.S.C. § 2251(d)(1)(A) conviction for making a "notice" seeking to receive child pornography
Caniff challenges his Count 2 conviction for violating 18 U.S.C. § 2251(d)(1)(A) and (2)(B), which provides:
(d)(1) Any person who, in a circumstance described in paragraph (2), knowingly makes, prints, or publishes, or causes to be made, printed, or published, any notice or advertisement seeking or offering-
(A)to receive, exchange, buy, produce, display, distribute, or reproduce, any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct;
....
shall be punished as provided under subsection (e).
(2) The circumstance referred to in paragraph (1) is that--
....
(B) such notice or advertisement is transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mailed.
(Emphasis added.)
The trial court, without objection, used the statutory language to instruct jurors that the Government had to prove beyond a reasonable doubt, among other elements, "that the defendant knowingly made, printed, or published or caused to be made, printed, or published any notice or advertisement," and "that such notice or advertisement sought or offered to receive ... any visual depiction ... that ... involved ... a minor child engaged in sexually explicit conduct." (Doc. 80 at 132-33.) Jurors deliberated for thirty minutes before they sent the court a question, inquiring: "What is the definition of the term 'notice' in Count Two, or should we determine that definition?" (Id. at 144.) The district court discussed the jury's question with counsel and then, without objection, responded to the jury: "You should determine the definition based upon the instructions you have." (Id. at 145.) The jury deliberated another half hour and then returned a verdict convicting Caniff of Count 2, as well as the other two counts.
On appeal, Caniff asserts only a single substantive argument, contending that there was insufficient evidence for a reasonable jury to find that the text messages he sent just to Mandy asking her to send him sexually explicit photos of herself were a "notice or advertisement" for purposes of § 2251(d)(1)(A). We review that argument de novo. See Dixon, 901 F.3d at 1335 (reviewing de novo whether evidence was sufficient to support conviction); see also United States v. Jim, 891 F.3d 1242, 1250-51 (11th Cir. 2018) (addressing statutory construction de novo), petitions for cert.
*933 filed (U.S. Jan. 10, 2019) (Nos. 18-891 and 18-895). We need not decide whether a jury could find that Caniff's text messages were "advertisements" because we conclude, instead, that a reasonable jury could find that those text messages were "notices" which § 2251(d)(1) made criminal.
The parties agree that, because the statute does not define "notice," that term must be given its ordinary or common, everyday meaning. This is consistent with the approach taken by other circuits addressing similar questions under § 2251(d)(1), see, e.g., United States v. Gries, 877 F.3d 255, 260 (7th Cir. 2017)petition for cert. filed (U.S. Jan. 7, 2019) (No. 18-858); United States v. Franklin, 785 F.3d 1365, 1367-68 (10th Cir. 2015), as well as consistent with the rules of statutory interpretation generally, see Barton v. U.S. Attorney Gen., 904 F.3d 1294, 1298 (11th Cir. 2018) (citing Sebelius v. Cloer, 569 U.S. 369, 376, 133 S.Ct. 1886, 185 L.Ed.2d 1003 (2013) ), petition for cert. filed, - U.S. - (U.S. Dec. 4, 2018) (No. 18-725).
Black's Law Dictionary defines "notice" to include "[a] written or printed announcement." Notice, Black's Law Dictionary (10th ed. 2014); see also Notice, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/notice (lasted visited December 12, 2018). See generally Wisconsin Cent. Ltd. v. United States, --- U.S. ----, 138 S.Ct. 2067, 2070-71, 201 L.Ed.2d 490 (2018) (looking to dictionary definition in determining ordinary meaning of a statutory phrase). Dictionary.com indicates that a "notice" can be "a note, placard, or the like conveying information or a warning." Notice, https://www.dictionary.com/browse/notice (lasted visited December 12, 2018). The Seventh Circuit noted that Webster's Third New International Dictionary (ed. 2002), similarly defines "notice" to include "a 'warning or intimation of something," as does the New Oxford American Dictionary (3d ed. 2010), which defines "notice," inter alia, "as a 'notification or warning of something.' " Gries, 877 F.3d at 260 (7th Cir.). A jury could find that Caniff's text messages to Mandy seeking sexually explicit photos fit this common meaning of "notice."
We disagree with Caniff's argument that a "notice" must be sent to the general public or at least to a group of people. The most common usage of the word "notice" is not limited exclusively to a public or group component. A notice can, of course, be made to the general public. Caniff points to such an example of "notice" cited by the Merriam-Webster Dictionary-newspaper notices of marriages and deaths. But a public component is not, by definition, required. The Tenth Circuit cited eighteen definitions of "notice" taken from Webster's New Third International Dictionary (1993), noting that none of those definitions required a "public" component. Franklin, 785 F.3d at 1368.[3] Thus, "[i]n everyday parlance," notice "is not limited to warnings or notifications disseminated to the general public, and nothing about the context in which [the term notice] is used here [in § 2251(d) ] suggests a more limited meaning." Gries, 877 F.3d at 260 (7th Cir.) (bracketed material added).
There are numerous examples where "notice" is given from one individual or entity to another. For instance, a utility company might send an individual customer "notice" that the utility is going to turn off that specific customer's service. Black's Law Dictionary uses the example of a *934 lease's requirement that a tenant give his landlord thirty days' written "notice" before vacating the leased premises. Notice, Black's Law Dictionary (10th ed. 2014). An employee might notify (or give notice to) his boss that the employee will not be at work tomorrow. One might notify a neighbor to get off the lawn or be sued for trespass, and a parent can give notice to a child that if he does not turn down his music, there will be consequences.
These common uses of "notice" do not require the involvement of the public or a group, and there is no indication that Congress intended any different use of "notice" in § 2251(d)(1). In fact, Congress used extraordinarily broad language in this provision. Congress did not include any adjective in § 2251(d)(1) to limit "notice," and certainly did not add "public" to modify "notice"-as one might expect Congress to have done had it wished to exclude private communications from the statute's coverage. Although this case involves a form of communication that was not in existence when the provision was written, private person-to-person communications have existed as long as the written word. And reading § 2251(d) to include text messages within its reach fits precisely within the category of statutory language that Justice Scalia has embraced as "encompassingly broad language that comes to be applied to technology unknown when the operative words took effect." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 86-87 (2012).
Indeed, instead of limiting the section's application to notice provided to a group or to the public at large, Congress used more expansive language, proscribing "any notice." (Emphasis added.) See Gries, 877 F.3d at 260 (7th Cir.) ("The phrase 'any notice or advertisement' in § 2251(d) casts a wide net for this offense."). As we have often had occasion to say, when interpreting a statute "any" means "all." Merritt v. Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir. 1997) ("[T]he adjective 'any' is not ambiguous; it has a well-established meaning. ... Congress did not add any language limiting the breadth of that word, so 'any' means all." (internal quotation marks omitted) ); see also Laperriere v. Vesta Ins. Grp., Inc., 526 F.3d 715, 726 (11th Cir. 2008) ("[T]he term 'any' in a statute has a 'broad,' 'powerful,' and 'expansive' meaning; it does not mean 'some' or 'all but a few,' but instead means 'all.' ") (internal quotation marks omitted); CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1223 (11th Cir. 2001) ("[R]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.' ") (internal quotation marks omitted). The use of "any" directs us to interpret "notice" as broadly as the word will bear. Furthermore, § 2251(d)(1) 's language explicitly focuses only on the defendant's conduct in making, printing or publishing a "notice," and does not address at all the audience receiving the notice.
Nor does the phrase "make ... notice" require a public audience. Perhaps it's an awkward turn of phrase that one wouldn't use in everyday parlance, but it cannot be described as specifying any particular form of communication. To the contrary, Black's Law Dictionary defines "make" as "caus[ing] (something) to exist < to make a record>." Black's Law Dictionary (10th ed. 2014); see also Random House College Dictionary (1982) ("to write or compose, as a poem"). Thus, as the Supreme Court has said, "[w]hen 'make' is paired with a noun expressing the action of a verb, the resulting phrase is 'approximately equivalent in sense' to that verb." Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011). In other words, "to make any notice"
*935 simply means "to notify," and Congress did not constrain in any way how the defendant could notify his recipient or recipients that he was seeking child pornography. See id.
Caniff points out that Congress proscribed "any notice or advertisement," and advertisement is commonly defined as "public notice." We have no occasion here to address what constitutes an "advertisement" for purposes of § 2251(d)(1). But Caniff's contention-that an "advertisement" is a "public notice"-cuts against his position because it implies that a simple notice without the adjective "public" is still a notice, needing only the addition of a public audience to be elevated to an advertisement. If the common, ordinary use of "notice" inherently requires a public component, as Caniff argues, there would be no need ever to modify notice with the adjective "public." Furthermore, if both notice and advertisement mean "public notice," then these two terms are largely redundant, and we are reluctant to conclude that two separate words in a statute are redundant. Cf. United States v. Harrison, 357 F.3d 314, 315, 321-22 (3d Cir. 2004) (rejecting, in the context of a prior version of U.S.S.G. § 2G2.2(b)(5), that "notice" requires a public audience because "if the meaning of 'notice' comprehended that it was 'public,' it would not be necessary to modify the definition of 'announcement' by designating it as a 'public' notice"), vacated on other grounds, 543 U.S. 1102, 125 S.Ct. 1027, 160 L.Ed.2d 1012 (2005). We conclude Congress must have, instead, meant that each of those terms-"notice or advertisement"-had an independent meaning. That is particularly true here because Congress separated the terms notice and advertisement by the word "or." See Loughrin v. United States, 573 U.S. 351, 357, 134 S.Ct. 2384, 189 L.Ed.2d 411 (2014) (rejecting interpretation that statute's two clauses, which were separated by "or," meant the same thing; stating that the "ordinary use" of "or" "is almost always disjunctive, that is, the words it connects are to be given separate meanings" (quoting United States v. Woods, 571 U.S. 31, 45, 134 S.Ct. 557, 187 L.Ed.2d 472 (2013) ).[4]
For these reasons, we reject Caniff's argument that "notice" requires a public or group component. Instead, "notice" can commonly and ordinarily include one-on-one communications like the text messages at issue here.[5]
Courts applying similar language in the sentencing guidelines have reached a like conclusion. U.S.S.G. § 2G2.2(c)(1), for example, provides a cross-reference that essentially enhances a defendant's offense level "[i]f the offense involved causing, transporting, permitting, or offering or *936 seeking by notice or advertisement, a minor to engage in sexually explicit conduct ... for the purpose of transmitting a live visual depiction of such conduct." (Emphasis added.) Courts have held that for purposes of that sentencing guideline, "notice" includes one-on-one communications as emails and instant messaging. See United States v. Long, 304 F. App'x 982, 986 (3d Cir. 2008) (unpublished) (holding instant messaging qualified as "notice" for purposes of § 2G2.2(c) 's cross reference). Long relied on Harrison, in which the Third Circuit held that a prior version of U.S.S.G. § 2G2.2(b)(5), which enhanced an offense level when "a computer was used for the transmission of ... a notice or advertisement of" child pornography, applied to emails the defendant exchanged with an undercover police officer. 357 F.3d at 315, 321-22.
Our conclusion-that "notice," for purposes of § 2251(d)(1), is broad enough to include individually directed text messages like the ones at issue here-is bolstered by the "comprehensive regulatory scheme" Congress enacted to "criminaliz[e] the receipt, distribution, sale, production, possession, solicitation and advertisement of child pornography." United States v. Parton, 749 F.3d 1329, 1330 (11th Cir. 2014) (internal quotation marks omitted) (addressing § 2251(a) ). When Congress enacted what is now § 2251(d) (which was originally designated as § 2251(c), see United States v. Pabon-Cruz, 391 F.3d 86, 88 n.2 (2d Cir. 2004) ), Congress noted that, "[o]f all of the crimes known to our society, perhaps none is more revolting than the sexual exploitation of children, particularly for the purposes of producing child pornography." H.R. Rep. No. 99-910, 99th Cong., 2d Sess. (1986). Congress's "clear statutory purpose" was to "eradicat[e] the child-pornography market." United States v. Peterson, No. CR 12-228-GW, 2015 WL 13657215, at *5 (C.D. Cal. Mar. 20, 2015) (unreported); see also United States v. Christie, 570 F.Supp.2d 657, 665 (D. N.J. 2008) (recognizing Congress's "primary intent" in enacting § 2251(d)(1) was "to eliminate the exchange of child pornography"). "Congress surely did not intend to limit [ § 2251(d)(1) 's] reach to pedophiles who indiscriminately advertise through traditional modes of communication like television or radio. Congress was trying to capture all advertisements or notices targeting individuals interested in obtaining or distributing child pornography." Franklin, 785 F.3d at 1369-70 (10th Cir.).
While Congress, in 1986, probably did not imagine the prevalence today of cell phones and the ease with which sexual predators can reach out to individual children to obtain child pornography, the language Congress used in § 2251(d)(1) is broad enough to encompass such conduct. Furthermore, this conduct goes to the heart of Congress's purpose in enacting § 2251(d)(1), to dry up the child pornography market. Once a predator is able to obtain such child pornography texted to him, he can quickly and easily disseminate it to countless others. Proscribing his doing so serves Congress's purpose in enacting § 2251(d)(1).
Through the one-on-one electronic communications at issue here, a sexual predator can more easily isolate and prey on a single vulnerable child victim than if he sent a widely disseminated notice to many potential victims. We cannot imagine that Congress intended to leave such a loophole in its otherwise comprehensive regulation of child pornography. Such a loophole would leave the most vulnerable of the victims of pedophilia unprotected against the most effective and hardest to detect predatory conduct. That would make no sense at all in a statute that was intended *937 to have a broad and comprehensive reach. See Gries, 877 F.3d at 260 (7th Cir.).
For all these reasons, we conclude that Caniff's text messages to thirteen-year-old Mandy asking her for sexually explicit pictures of herself can support the jury finding that he made "notices" that he desired to receive child pornography.
It may have been preferable for the district court here to have provided the jury with a legal definition of "notice." But Caniff did not object to the court using just the statutory terms to instruct the jury, nor did he object to the court's decision to respond to jurors' inquiry during deliberations by indicating that they should determine the definition of "notice." Nor has Caniff argued on appeal that the district court made any legal error in submitting this term to the jury for its determination. That issue is, consequently, not presented to us and we, thus, do not address it in this appeal.
We conclude that, in light of the district court's instructions given here, there was sufficient evidence for the jury to find that Caniff's text messages to Mandy requesting photos of her engaging in sexually explicit conduct were "notices" made criminal under § 2251(d)(1).
B. There was sufficient evidence for a jury to find that Caniff believed Mandy was thirteen
Caniff next challenges each of his three convictions, arguing that, in light of his defense that he believed that he was text messaging with an adult woman who was role playing the part of a thirteen-year-old, there was insufficient evidence for the jury to find that he believed he was texting a minor. "We review de novo the sufficiency of the evidence, ... view[ing] the evidence in the light most favorable to the government and draw[ing] all reasonable inferences and credibility choices in favor of the jury's verdict." Dixon, 901 F.3d at 1335 (internal quotation marks and citation omitted).
We will not reverse unless no reasonable trier of fact could find guilt beyond a reasonable doubt. It is not our function to make credibility choices or to pass upon the weight of the evidence. Instead, we must sustain the verdict where there is a reasonable basis in the record for it.
United States v. Farley, 607 F.3d 1294, 1333 (11th Cir. 2010) (citations, internal quotation marks omitted).
There is a reasonable basis in this record to support the jury's finding that Caniff believed Mandy was a minor. During their exchange of text messages, Mandy expressly told Caniff several times that she was thirteen. See United States v. Rutgerson, 822 F.3d 1223, 1228-30, 1232-33 (11th Cir. 2016) (holding there was sufficient evidence for jury to find defendant believed he was electronically conversing with fifteen-year-old because she told him in her emails and text messages that she was fifteen); United States v. Yost, 479 F.3d 815, 819 (11th Cir. 2007) (per curiam) (holding there was sufficient evidence for jury to find that the defendant acted with specific intent to persuade a minor to engage in criminal sexual activity where "both girls told Yost they were under-age multiple times"). In addition, a jury could find that much of Mandy's text messages suggested that she was thirteen-being on spring break, not old enough to drive, and being sexually inexperienced. Furthermore, there was nothing in their text messages that expressly or even inferentially suggested that Mandy was an adult or that either Caniff or Mandy were only role playing.
To be sure, there was some other evidence from Caniff after his arrest where *938 he professed to believe Mandy was an adult who was role playing to be a minor-Caniff's statements to police, for example, during his interview immediately after his arrest-from which the jury could have found instead that Caniff thought Mandy was an adult role-playing as a thirteen-year-old. But at the very most, that sets up conflicting evidence. However, we must on this appeal take the evidence in the light most favorable to the government and ask only if there was enough, if that evidence was believed, to cause a reasonable jury to convict. In light of that, we must uphold Caniff's convictions. See Farley, 607 F.3d at 1300, 1333-34 (holding evidence was sufficient for trial court conducting bench trial to find that defendant who believed he was texting a mother about having sex with her and her ten-year-old daughter "was 'for real,' and to disbelieve his insistence at trial that it was all a fantasy"); Yost, 479 F.3d at 819 (holding there was sufficient evidence for jury to find that defendant had specific intent to persuade minor to engage in criminal sexual activity, despite his assertion that "he believed he was communicating with adult women role-playing as minors").
C. The district court did not abuse its discretion in permitting Detective Greene's challenged testimony
Lastly, Caniff challenges Detective Greene's testimony regarding the contents of Caniff's cell phone. After Caniff's arrest, Detective Greene interviewed Caniff and searched his cell phone. On direct examination, the detective testified that on Caniff's cell phone he found pictures of a penis and the text messages that Caniff and Mandy exchanged. During cross-examination, defense counsel asked Detective Greene if he found anything else on Caniff's cell phone:
Q.... Other than that, there was nothing else in the phone of any evidentiary value, correct?
A. In reference to this case, no -- or, I mean --
Q. In reference to anything.
A. -- any other case that I knew of, yes.
Q. There was no other illegal activity - - even if that's illegal activity, there was no illegal activity in the phone, correct?
A. Correct.
Q. Okay. There was no child pornography in his phone, correct?
A. Correct.
Q. There were no chats on his phone that were inappropriate or illegal, correct?
A. Correct.
Q. Okay. The only thing found on his phone was adult pornography, correct?
A. To the best of my knowledge, yes.
Q. Okay. And nothing illegal with what he had, correct?
A. Correct.
(Doc. 80 at 23.) On redirect, the prosecutor asked:
Q. Okay. Now [defense counsel] asked you if there was evidence of any -- I think she said there was no -- she said there was no evidence of any illegal activity in the phone.
Is it your understanding that the text messages are evidence of illegal activity that is what brings us here today?
A. Yes.
[Defense counsel]: Objection, Your Honor. He's asking for an opinion. That's the whole issue in this courtroom today.
THE COURT: Give me just a moment.
I'll overrule the objection. You may answer the question, Detective.
THE WITNESS: Thank you.
*939 I assumed aside from what we were here to discuss today, but yes, I found nothing else that was apparent -- apparently illegal in the phone outside of this.
BY [Prosecutor]:
Q. But you gathered the evidence of the text messages.
A. Yes.
Q. And based on the judge's ruling, you can answer. Was that, in your opinion --
A. Yes.
Q. -- evidence of illegal activity.
A. Yes.
Q. And the same question for the photos of the penises that were sent to Agent Beccaccio.
Is it -- based on your training and --
[Defense counsel]: Your honor, same objection.
THE COURT: Same ruling.
BY [Prosecutor]:
Q. Based on your training as a law enforcement officer, did you deem those to be evidence of illegal activity?
A. Yes.
(Doc. 80 at 25-26.)
We review the district court's evidentiary ruling for an abuse its discretion. See United States v. Augustin, 661 F.3d 1105, 1123 (11th Cir. 2011) (per curiam). Caniff argues primarily that this testimony violated Fed. R. Evid. 704(b), which "[i]n a criminal case," precludes an expert's "opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone."[6] But Detective Greene was never offered or qualified as an expert witness. "[J]ust because a lay witness's position and experience could have qualified him for expert witness status does not mean that any testimony he gives at trial is considered 'expert testimony.' Lay witnesses may draw on their professional experiences to guide their opinions without necessarily being treated as expert witnesses." United States v. Jeri, 869 F.3d 1247, 1265 (11th Cir. 2017) (citation, internal quotation marks, alterations omitted) (holding police officer did not testify as expert even though his testimony "showed [his] familiarity with narcotics investigations and his experience interviewing drug couriers"), cert. denied, --- U.S. ----, 138 S.Ct. 529, 199 L.Ed.2d 405 (2017).
Moreover, even if Detective Greene did give expert testimony, Rule704(b) only precludes an expert from "expressly stat[ing] a conclusion that the defendant did or did not have the requisite intent" and from stating "an opinion as to the defendant's state of mind at the time of the offense." Jeri, 869 F.3d at 1266 (internal quotation marks omitted). But Rule 704(b) does not preclude even "expert testimony that supports an obvious inference with respect to the defendant's state of mind if that testimony does not actually state an opinion on this ultimate issue, and instead leaves this inference for the jury to draw." Augustin, 661 F.3d at 1123 (internal quotation marks, alteration omitted). Detective Greene's challenged testimony may be ambiguous, but it clearly did not expressly address Caniff's mental state. Detective Greene's testimony did not at all address whether Caniff believed Mandy was thirteen.
*940 Detective Greene, on rebuttal, testified only that he found "evidence of illegal activity" on the phone. Indeed, he did not even say what that evidence was or whether it related at all to Caniff's state of mind. "Evidence of illegality" could as easily have referred to other elements of illegality other than the mens rea element.
But even if we could say that the district court abused its discretion in permitting Detective Greene's challenged testimony, any error was harmless because there is no "reasonable likelihood that it affected [Caniff's] substantial rights." Augustin, 661 F.3d at 1123 (internal quotation marks, alterations omitted). It was defense counsel, not the Government, who first asked the detective if there was "illegal activity" on the phone. The Government, on redirect, was merely attempting to clarify any confusion the detective's responses on cross-examination may have created, and to explain why he gathered the text messages as evidence. We cannot conclude the district court abused its discretion in admitting this testimony but even if the district court did so, any error was harmless.
III. CONCLUSION
For the foregoing reasons, we reject Caniff's challenges to his three convictions and AFFIRM.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

As noted previously, Whisper only requires users to be thirteen years old or older. There is no evidence about how, or if, that age restriction is enforced.

In Franklin, the Tenth Circuit, nevertheless, assumed for purposes of its analysis, without deciding, that 18 U.S.C. § 2251(d)(1) 's use of the term "notice" had a public component. 785 F.3d at 1369.

For the first time in response to one of the Government's Fed. R. App. P. 28(j) letters, Caniff directly invokes the statutory interpretative canon "noscitur a sociis" ("statutory terms are often known by the company they keep," Lagos v. United States, --- U.S. ----, 138 S.Ct. 1684, 1688, 201 L.Ed.2d 1 (2018) ), as well as "negative implication," to argue, without any analysis, that "§ 2251(d) requires a public component." (Caniff's Nov. 1, 2018, response.) That argument is not particularly helpful here to define one of two statutory terms. See Franklin, 785 F.3d at 1369 (10th Cir.) (rejecting application of noscitur a sociis to define "advertisement" and "notice" under § 2251(d) ). See generally Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 559 U.S. 280, 288, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010) (stating that application of noscitur a sociis canon was not persuasive in that case because "list of three items, each quite distinct from the other no matter how construed, is too short to be particularly illuminating").

Caniff does not assert any other arguments regarding the meaning of "notice," so we address only his "public" component argument.

Rule 704 provides:
(a) In General - Not Automatically Objectionable. An opinion is not objectionable just because it embraces an ultimate issue.
(b) Exception. In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.